## STATEMENT OF OFFENSE

### Background

1.  Members of the Metropolitan Police Department's ("MPD") Carjacking Task Force are investigating two establishment robberies that occurred on January 29, 2026, in Washington, D.C.

### Offense 1 – Attempted Armed Robbery – Chipotle Restaurant – CCN: 26012929

2.  On January 29, 2026 at approximately 7:05 p.m., the DC Office of Unified Communications (OUC) received a 911 call for an Armed Robbery at 2300 Washington Place NE, Washington, D.C. The call notes stated that an establishment had been robbed at the location. Officers responded to the location and found that the same suspect had attempted to rob one (1) establishment, and then successfully robbed a second establishment. A Fifth District MPD detective was requested to respond to the location. Detective Jattan responded to assist in the investigation.

3.  It was determined that the suspect had first entered the Chipotle Restaurant located at 2300 Washington Place NE. Detective Jattan interviewed Witness-1 (W-1). W-1 stated that the suspect (S-1) entered the establishment and walked up to the cash register. W-1 observed that S-1 was holding a black handgun in his hand, and S-1 stated, "Open the register."

4.  W-1 told S-1 that IT could not open the registered without a manager. At this time Witness-2 (W-2) then walked by W-1 and observed S-1 holding the black handgun, pointing it at W-1. S-1 then told W-2 to open the register, but W-2 refused to open the register. After W-2 refused to open the register, S-1 then walked out of the Chipotle without obtaining any property.

1

5.  Both witnesses described S-1 as an older black male (over 40 years old), with a dark complexion, wearing a dark jacket, red bag, and holding a black handgun. After the robbery, W-1 left the store in an attempt to flag down security.

6.  Video footage was obtained from the location. The video footage shows S-1 walk into the Chipotle at 6:58 p.m. and walk to the register. S-1 is observed wearing a blue puffy jacket with the hood pulled up, black pants, brown shoes, and carrying a red/gray duffel bag.



*Figure 1: S-1 entering Chipotle.*

7.  S-1 then walks up to the register and appears to be conversing with W-1. Then S-1 appears to pull out an object from his right coat pocket and holds the item out.



*Figure 2: S-1 holding item in his hand.*

8. There is no audio on the video footage, but S-1 can be clearly seen conversing with W-1. Another employee walks up and appears to be talking with S-1 as well. S-1 then walks away from the register, waits for a moment, and then walks back over to the register. As S-1 is walking up to the register a second time, he can be clearly seen holding an item, in a manner consistent with holding a firearm, in front of his body.


*Figure 3: S-1 holding item in his hand.*

9. S-1 then walks back to the register and is observed conversing with W-1 again. As before, S-1 can be observed having a conversation with W-1, but W-1 is never able to open the register.


*Figure 4: S-1 at cash register.*

4

10. At 7:01 p.m., S-1 finally walks out of the establishment without obtaining any property. As S-1 is walking out of the store, the red/grey duffel bag that he is wearing around his shoulder is clearly visible.


*Figure 5: S-1 with red/grey duffel bag.*

**Offense 2 –Armed Robbery – Jersey Mike's Restaurant – CCN: 26012909**

11. It was determined during the initial investigation that the same suspect robbed a second establishment, the Jersey Mike's restaurant, which is located adjacent to the Chipotle restaurant. S-1 appeared to have walked directly into Jersey Mike's after leaving the Chipotle empty handed.

12. Detective Jattan interviewed Witness-3 (W-3). W-3 stated that S-1 walked into the establishment and walked up to the front counter. S-1 told W-3 that he was picking up an order

5

under the name "Mike". W-3 then began to look for the order, when W-3 observed S-1 pull out a handgun. As soon as W-3 observed the handgun, she ran to the back of the store.

13. Witness-4 (W-4) was also interviewed. W-4 was working at the prep station at the front counter of the restaurant. W-4 observed W-3 run to the back of the store for an unknown reason, and then looked over at the front register and observed S-1 standing there. S-1 was pointing the handgun at W-4 at stated, "Give me all that shit!"

14. W-4 stated that S-1 "cocked" the handgun as he pointed it at her. W-4 then walked over to the register and opened the cash drawer. W-4 pulled out currency that she put on the counter, and which S-1 took. S-1 then fled out of the store.

15. W-4 reported that S-1 stole approximately $431 in U.S. currency from the cash drawer.

16. After the events of Offense 1, one of the employees from the Chipotle left the location and flagged down Witness-5 (W-5) and Witness-6 (W-6) who work for the security company at Rhode Island Row. W-5 and W-6 stated that they both observed a subject matching the description of the suspect fleeing towards the Rhode Island-Brentwood Metro Station, but they did not realize that the individual was S-1 until being notified by the employees.

17. Video footage was obtained from the Jersey Mike's. The video footage shows the suspect enter the location at 7:01 p.m. and walk up to the front register. S-1 is observed wearing all the same clothing and has the same red/grey duffel bag around his shoulder that S-1 had when he was inside the Chipotle. S-1 is observed speaking with W-3. As W-3 walks up to the front register, S-1 is observed pulling out a black handgun and pointing the handgun at W-3.



*Figure 6: S-1 pointing handgun.*

18.     W-3 is observed running to the back and then S-1 approaches W-4.  W-4 is observed walking over to the register and opening the cash drawer. W-4 is observed taking money out of the register and placing it onto the counter. S-1 is observed taking the money when W-4 places it on the counter.



*Figure 7: S-1 taking the currency from W-4.*

19.  S-1 then takes the handful of U.S. currency that he just took from W-4 and flees from the store.

20.  Based on the video footage, S-1 is observed wearing distinctive clothing and with a distinct red/grey duffel bag.



*Figures 8, 9, 10: Images of S-1 from offense locations.*

## Additional Investigation

21.     On January 30, 2026, your affiant responded to the Real Time Crime Center (RTCC) to view the WMATA footage around the time of Offense 1 and Offense 2. Before the offenses, S-1 is observed walking from Rhode Island Avenue Northeast through the front entrance of the Rhode Island Metro Station at 6:45 p.m. After exiting the metro station, S-1 walks in the direction of the offense locations.

22.     After the two robberies, S-1 is observed running toward the front entrance of the Rhode Island Metro Station. At approximately 7:03 p.m., S-1 boards a WMATA bus (bus number 4795) in front of the station. S-1 does not appear to use a SmarTrip card or pay a bus fare when he boards the bus.



*Figures 11, 12: S-1 boarding Metro Bus after offenses.*

23.    S-1 rides that WMATA bus until the stop near the intersection of Rhode Island Avenue NE and South Dakota Avenue NE where he exits at approximately 7:21 p.m.

24.    On January 31, 2026, your affiant responded to 2314 Rhode Island Avenue NE to obtain footage from the exterior cameras. The time stamp on the footage is correct. S-1 is observed exiting the WMATA bus at the stop at Rhode Island Avenue Northeast and South Dakota Avenue Northeast. S-1 walks across Rhode Island Avenue Northeast in front of 2314 Rhode Island Avenue Northeast and enters the convenience store located at 2310 Rhode Island Avenue NE.



*Figures 13, 14: S-1 walking towards convenience store after offenses*

25.    Also on January 31, 2026, your affiant responded to the convenience store at 2310 Rhode Island Avenue Northeast to view/receive the surveillance footage at the location. The

timestamp appears to be correct. S-1 enters the store, makes a purchase and walks out of the store. S-1 pays for the items in cash.

26. From the surveillance footage at this location, S-1's clothing and features can clearly be seen.



*Figures 15, 16: Images of S-1 from the convenience store.*

27. While inside of the convenience store S-1 is observed purchasing two (2) boxes of Newport cigarettes and two (2) distinct red "torch" style lighters. As S-1 is making the purchase, he pulls out U.S. Currency and counts it on the front counter. S-1 is then observed exiting the convenience store and walks across the street to the Family Dollar located at 2305 Rhode Island Avenue NE.

28. Detectives were able to recover video footage from the Family Dollar. The timestamp appears to be correct. S-1 enters the store, puts the red duffel bag down behind the front

counter and makes a purchase from the location. S-1 regains possession of the red duffel bag before exiting the store.

29. The video footage from the Family Dollar clearly shows S-1, and also has a clear view of his face, clothing, and the bag he is carrying.



*Figures 17, 18: S-1 entering the Family Dollar store.*

30. S-1 is then observed exiting the Family Dollar, and walks back eastbound down Rhode Island Avenue NE towards South Dakota Avenue NE. This is the same location where S-1 exited the Metro Bus.

31. Because S-1 fled from the offense location on a Metro Bus, it is believed that S-1 arrived at the offense location also utilizing a Metro Bus. Metro Transit Police Department (MTPD) Detective E. McCarty reviewed Digital Video Recorder (DVR) footage from the Washington Metropolitan Area Transit Authority (WMATA) Rhode Island Metro Station, located

at 801 Rhode Island Ave NE, Washington, DC, and various WMATA buses in relation to these offenses.

32. Detective McCarty determined that on January 29th, 2026, S-1 originally boarded WMATA bus 3335 at approximately 5:21 p.m. in front of 3298 Fort Lincoln Drive NE, Washington, D.C., and exited the bus at approximately 5:58 p.m. on Rhode Island Ave NE at a bus stop adjacent to 8th Place NE, Washington, DC. S-1 took the pedestrian foot bridge, crossing over Rhode Island Ave Northeast, to the Rhode Island Ave Metro Station. S-1 was captured on WMATA DVR wearing the same clothing, glasses, and carrying the same duffel bag, as during the offenses under investigation.

33. Because S-1 boarded the Metro Bus in front of 3298 For Lincoln Drive NE, it is believed that he may have gone back to that location after the offense. Detectives were able to review video footage from 3298 Fort Lincoln Drive NE on January 29, 2026. A review of the video footage showed that S-1 exited the building prior to the offense and returned to the building after the offenses. It is unknown which specific apartment inside of the building S-1 leaves from and returns to.

**Identification of S-1**

34. When Detective McCarty reviewed video footage from WMATA bus 3335, from the day of the offenses, Detective McCarty observed that S-1 had a conversation with the WMATA bus operator that was captured on the DVR audio. S-1 mentioned to the operator that he was the same person who drove him on a prior day. Detective McCarty determined the same operator was driving WMATA bus 2884 on January 23rd, 2026. A review of the DVR from WMATA bus 2884 on January 23rd, 2026, revealed S-1 boarded at approximately 5:32 p.m. At the time he boarded the bus he was wearing the same clothing, glasses, and carrying the same duffel bag, as he was

wearing during the offenses under investigation. The photographs below were captured from bus 2884 and are provided for reference:

  

*Figures 19, 20, 21: S-1 on Metrobus 2884 on January 23, 2026.*

35. The WMATA bus operator and S-1 were engaged in conversation for the majority of the trip which was captured on DVR audio. Prior to exiting the bus, S-1 told the bus operator his name was Alvin. S-1 went on to explain that he had daughters named Alexandra, Andrea, and Amari.

36. Detective McCarty queried the MPD RMS system for all persons named Alvin. Detective McCarty located an individual named Alvin PONSON, with a date of birth of ▇▇▇▇▇, bearing a strong resemblance to the person that committed these offenses. Detective McCarty conducted a query in a law enforcement database and discovered PONSON had a relative with the first name Andrea. Additional queries revealed Andrea had relatives named Alexandrea and Amari.

37. Another query in the MPD RMS database revealed PONSON had contacts with law enforcement on November 30th, 2025 (MPD CCN 25181283) and December 3rd, 2025 (MPD

14

CCN 25182734). Both instances were calls related to a family disturbance at ███ █ ████████ ████████████.

38. Detectives were able to review MPD Body Worn Camera (BWC) footage from the November 30th, 2025, incident, which revealed PONSON was carrying the same duffel bag as during the offenses under investigation.



*Figures 22, 23: Images of PONSON with red/gray duffel bag on 11/30/25.*

39. A review of the MPD BWC footage from the December 3rd, 2025, incident revealed PONSON was wearing the same hat, glasses, and sweatshirt, as during the offenses under investigation.



*Figure 24: Still image of PONSON from MPD BWC on 12/3/25.*

## ARREST OF PONSON

40. On February 4, 2026, your affiant and Detective McCarty responded to ▮▮▮ ▮ ▮▮▮▮▮▮▮ in order to speak with IP-1 and IP-2 in regard to the ongoing investigations. Coincidentally, IP-3 – a Community Supervision Officer ("CSO") employed by the Court Services and Offender Supervision Agency ("CSOSA") was present at ▮▮▮ ▮ ▮▮▮▮▮▮▮ as well. Your affiant and Detective McCarty learned that IP-3 was in the area to conduct a home visit at the same residence they were intending to visit. IP-3 was shown a still photograph of the Suspect and identified S-1 as PONSON. IP-3 stated that they were in contact with PONSON and that he would be meeting IP-3 at the residence. IP-3 met with PONSON while additional members of MPDC responded to the area to surveil the residence.

41. IP-3 completed the home visit and left the residence without incident. At approximately 5:10 p.m., PONSON was observed exiting ▮▮▮ ▮ ▮▮▮▮▮▮▮ and was stopped by

members of MPDC and Federal Law Enforcement partners. PONSON was placed under arrest for Offense 1 and Offense 2.

42. Search incident to arrest, MPDC members located and seized a cell phone, red torch lighter, and a quantity of suspected crack cocaine. The red torch lighter appeared to be similar if not identical to the one PONSON was observed purchasing at the convenience store shortly after the robberies.

43. While reviewing surveillance video in connection with this investigation, law enforcement observed PONSON using a cell phone. At this time, it is unknown whether PONSON possesses multiple digital devices.

44. Detective McCarty then met with IP-1 and IP-2, both of whom witnessed PONSON's arrest from their residence, which is shared with PONSON. At approximately 5:17 p.m., Detective McCarty showed IP-1 a still image of the Suspect; IP-1 immediately identified the Suspect as PONSON. Detective McCarty then showed IP-2 a still image of the Suspect; IP-2 also immediately identified the Suspect as PONSON.

45. In conversation with IP-1 and IP-2, it was learned that PONSON was intermittently residing at the residence. IP-1 and IP-2 identified a bedroom PONSON was using, as well as personal belongings in the living room of the residence.

### Interview of PONSON

46. At the Seventh District station, PONSON was brought to an interview room in the Seventh District Detective's office. Detective Rimel read and explained to PONSON his *Miranda* rights. PONSON stated that he understood his rights, waived his rights, and agreed to be interviewed.

47. Detectives showed PONSON still images from the video footage recovered from the Family Dollar after the offenses. PONSON identified himself as the individual in the still images from the Family Dollar store. PONSON was also shown the video footage from the scenes of the offenses under investigation. PONSON stated that he was not the suspect in the video footage of the offenses and denied committing any robberies.

48. PONSON did state that he was at the Chipotle, but that he was there to meet a friend and the friend never showed up. PONSON advised that when his friend did not arrive at the Chipotle, he left. PONSON did not provide the date he was at the Chipotle.

**Execution of Emergency Residential Search Warrant at** ▮▮▮▮▮▮▮▮▮▮

49. Following PONSON's arrest, law enforcement secured ▮▮▮▮, and obtained an emergency residential search warrant from the Superior Court of the District of Columbia. Detectives responded to ▮▮▮▮ to execute the search warrant. One bedroom in the apartment was identified as belonging to PONSON.

50. In that bedroom, law enforcement located the red and grey duffel bag consistent with the bag the suspect was observed wearing during the offenses. Law enforcement also located clothing consistent with that worn by the suspect during the offenses, including: a pair of brown boots with black on the front; a blue/black puffy jacket; and a reddish-brown hooded sweatshirt.



*Figure 25: Blue/black puffy jacket seized during execution of search warrant.*




*Figures 26, 27: Red and grey duffel bag seized during execution of search warrant (Left). Brown Boots with black tips seized during execution of search warrant (Right).*

51. During the execution of the search warrant, detectives spoke with IP-1. IP-1 advised that on November 17, 2025, they were going through some of PONSON's items in his bedroom. IP-1 told detectives that as they were going through a bag in PONSON's bedroom, they located a black toy handgun in the bag. IP-1 took a photo and a video of the toy gun, which IP-1 provided to detectives. IP-1 advised that they believed that PONSON took the bag containing the toy gun out of the apartment after IP-1 found the bag.

19

**CONCLUSION**

52. Your affiant submits that based on the investigation discussed above, there is sufficient evidence to find probable cause that PONSON was involved in the attempted robbery of the Chipotle, and the robbery of the Jersey Mikes, on January 29, 2026, in violation of 18 U.S.C. § 9151 and 18 U.S.C. § 924(c). This is based on your affiant's review of the surveillance video of the offenses as well as the identification of PONSON by IP-1, IP-2, and IP-3 as the individual in still images of surveillance video recovered by law enforcement. Additionally, during the execution of the search warrant of PONSON's bedroom at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, law enforcement observed clothing, and a red and grey duffel bag, consistent with that worn by the suspect during the offenses.

53. Accordingly, for the reasons discussed above, your affiant submits there is probable cause to believe that PONSON violated 18 U.S.C. § 1951 and 18 U.S.C. § 924(c).

Respectfully submitted,

_____
Affiant
Detective David Naples
Badge Number D2-1522
Metropolitan Police Department
Carjacking Task Force

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) by telephone on February 5, 2026.

_____
HONORABLE MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE